UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BLUEMOUNTAIN EQUITY ALTERNATIVES MASTER FUND L.P. <br><br> Plaintiff, <br><br> -v- <br><br> PORSCHE AUTOMOBIL HOLDING SE, f/k/a Dr. Ing., h.c. F. Porsche AG; WENDELIN WIEDEKING; and HOLGER P. HAERTER, <br><br> Defendants. | **ECF CASE** <br><br> Civil Action No. 10 CIV 8084 <br><br> **COMPLAINT AND JURY DEMAND** <br><br> RECEIVED OCT 2 5 2010 U.S.D.C. S.D.N.Y. CASHIERS |

Plaintiff BlueMountain Equity Alternatives Master Fund L.P. ("Plaintiff" or "BMEA"), by and through its attorneys, alleges the following based on Plaintiff's personal knowledge and its counsel's investigation.   Counsel's investigation included, among other things, review of press releases by Volkswagen AG ("VW") and Defendant Porsche Automobil Holding SE, f/k/a Dr. Ing. h.c. F. Porsche AG ("Porsche," and along with Porsche's former Chief Executive Officer Wendelin Wiedeking ("Wiedeking") and former Vice President of Finance Holger P. Haerter ("Haerter"), the "Defendants"), public statements by Defendants, security analysts' reports concerning Porsche and VW, Porsche's and VW's financial disclosures, news reports about Porsche and VW, and the parties' public filings in the litigation pending in this District under the caption *Elliott Associates, L.P., et al. v. Porsche Automobil Holding SE, f/k/a Dr. Ing. h.c. F. Porsche AG, et al.*, Civil Action No. 10 Civ. 0532 (HB)(THK), and *Black Diamond Offshore Ltd., et al. v. Porsche Automobil Holding SE, et al.*, Civil Action No. 10 Civ. 4155 (HB)(THK).   A reasonable opportunity for discovery likely will reveal substantial additional evidentiary support for the allegations set forth below.

## NATURE OF THE ACTION

1.     Throughout 2008, there was wide market consensus that VW's stock was wildly overvalued, given its economic fundamentals. As stocks in the rest of the automotive sector, including its close competitors like Mercedes-Benz, were taking a beating as a result of the worldwide financial crisis and economic downturn, VW's stock continued to appreciate. As is often the case when investors become cognizant of a company whose fundamental economics do not appear capable of supporting its stock price, numerous market participants took short positions in VW's stock.

2.     Agreeing with the market consensus, between July 8, 2008, and September 19, 2008, BMEA, a hedge fund managed in New York, established short positions worth millions of dollars in VW stock through security-based swap agreements entered into with New York-based Morgan Stanley in the United States. In these contracts, BMEA and Morgan Stanley agreed to exchange cash flows that depend on the price of a reference security, here VW shares. From BMEA's perspective, the swap agreement generated gains as the price of VW shares declined and generated losses as the price of VW shares rose, achieving an economic result similar to a short sale. Securities-based swap agreements are not traded on any exchange, foreign or domestic. BMEA's securities-based swap agreements were transacted in the United States and, as a result, fall within the scope of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act").

3.     In opening these positions, BMEA pursued an investment strategy based on the expectation of positive returns when the market price of VW's ordinary shares adjusted by dropping to a level that more accurately reflected the true state of its business. Unbeknownst to BMEA, however, this price adjustment would never materialize, because BMEA was the victim of a massive scheme to manipulate the price of VW shares that was orchestrated and executed by VW's largest shareholder, Porsche.

4.     Throughout 2008, Porsche, at the direction of defendants Wiedeking and Haerter, was cornering the market in VW shares and was carefully managing the price of VW shares to

induce BMEA and other investors to enter into short sales and securities-based swap agreements as a means by which Porsche could acquire more and more VW shares. This strategy had two components. First, Porsche publicly denied that it had any intention of acquiring more than 51% of VW, which had the effect of artificially depressing the price of VW ordinary shares during the spring and much of the summer of 2008. Second, while maintaining its public denials, Porsche systematically locked up for itself virtually all VW shares that were available for purchase on the open market (including many shares that had been borrowed and sold by other short investors) so that it would actually achieve control of 75% of VW and thereby be able to dominate the company. The intent and effect of this manipulative strategy was to restrict vastly the number of shares available for circulation, which had the effect of artificially increasing demand for VW shares and putting the stock price on a sharp upward trend through September and October 2008. Thus, by breaking the law, Porsche cornered the market in VW shares (a) with false denials of its intent to take over VW and efforts to do so, and (b) by engaging in a series of manipulative derivatives trades to hide the extent to which Porsche controlled VW shares.

5. BMEA opened its short positions during July 2008, when VW's stock was trading at around €170 per share. With its losses mounting, BMEA was compelled to close out its positions on or about September 18, 2008, when the stock was trading at over €304 per share, thereby suffering millions of dollars in damages.

6. The story of Porsche's fraudulent manipulation begins in early 2008. On February 25, 2008, Porsche representatives held a secret meeting in Berlin with a high-ranking officer of the German State of Lower Saxony participating on behalf of the State's Prime Minister, Christian Wulff. (Lower Saxony owned slightly more than 20% of VW's shares at all relevant times.) At the meeting, according to German press accounts that surfaced more than a year later, Porsche disclosed to Lower Saxony its intention to implement a "domination agreement" with VW. A domination agreement between an acquiring firm and a target firm

allows the acquiring firm to control the target firm's decisions.[1]  Typically a bidder can put a domination agreement into place after acquiring 75% of the voting shares of the target company. But VW's articles and a German law known as the "VW Law" required approval by holders of 80% of VW's shares, 5% more than the typical threshold.  Nevertheless, Porsche sought to obtain ownership of 75% of VW's shares as a first step toward domination (coupled with a strategy of challenging the validity of the VW Law under the superior laws of the European Union).  With 75% ownership, Porsche could achieve domination if (a) it was able to strike a deal for domination with Lower Saxony, or (b) the European Court of Justice abolished the restrictions raising the requirements for domination over VW from 75% to 80%, as Porsche expected eventually would occur.  Porsche set out to secretly build its stake toward 75%.

7.      In order to accomplish its goal, Porsche needed to hide its plan while it acquired control over nearly 75% of VW's shares.  Porsche hid its plan in two ways.

8.      The first way that Porsche hid its plan was by lying to the market.  From March 2008 until just days before it revealed the truth, Porsche consistently denied that it was seeking to take over VW and said that it would not raise its stake above a simple majority.  These statements were false, since Porsche had decided to take over VW at least as early as February 2008, and by the late summer of 2008 had achieved control of nearly 75% of VW stock through outright positions and call options, as alleged in more detail below.  After BMEA had suffered its losses at the hands of Porsche's manipulation, Frank Gaube ("Gaube"), Porsche's head of investor relations, subsequently admitted publicly that Porsche had intentionally kept its true strategy secret:  "We are a very small company buying into a very big company.  That is not something you can afford if everybody is able to read your strategy in the newspaper."

9.      VW also knew that Porsche was lying about its intentions.  In an interview published on May 12, 2009, long after Porsche's strategy had run its course, VW chairman and Porsche shareholder Ferdinand Piech conceded that Porsche had decided to increase its stake in

---

[1] *See* Thomas Stohlmeir, *German Public Takeover Law: Bilingual Edition with an Introduction to the Law* 119-20 (2002).

VW up to 75% as early as mid-year 2008. Whether that is the first time Piech and VW learned of Porsche's secret plan remains to be determined in discovery, but Piech's admission demonstrates that Porsche lied, for example, on September 18, 2008 -- the very same day that BMEA was forced to close its open short positions in VW -- when it told an online magazine that a domination agreement with VW was "totally unrealistic." If Piech and VW understood the extent of Porsche's control at the time of that statement, then Piech and VW also knew that Porsche was lying.

10.    The second way that Porsche hid its plan was by manipulating the market in VW shares. Porsche concealed its plan by acquiring much of its position in VW shares through options contracts it entered into in 2007 and 2008. Porsche used these contracts to manipulate the market and, starting in September 2008, artificially inflate its stock price. Two features of Porsche's options trades made them manipulative.

11.    The first feature that made Porsche's options trades manipulative was that Porsche disguised physical options contracts -- contracts that it should have disclosed but did not -- as cash-settled options contracts that did not have the same disclosure requirements. That Porsche did not really consider its options contracts to be cash settled is clear from what Porsche said when it revealed on October 26, 2008, that it actually controlled nearly 75% of VW's stock. In the course of that announcement, Porsche admitted that its options actually reflected part of its "74.1%" control and, lest anyone doubt Porsche's control over the shares represented by the option contracts, minimized the cash settled nature of the contracts by calling them the "so called" cash-settled options. Porsche used the options as a means to acquire control over VW shares, not as a means to benefit, in cash, from a rise in the price of VW shares. Since Porsche had the ability and intention to convert these options into actual share ownership, it should have disclosed its position under applicable law, but it did not do so.

12.    The second feature that made Porsche's options trades manipulative was that Porsche methodically parceled out its options contracts to evade counterparty-disclosure requirements. Porsche knew that the counterparties to its options contracts would purchase VW

shares to hedge the options.  Indeed, that accumulation of shares was crucial to Porsche's plans, because Porsche intended eventually to take delivery of those shares.  But if any one of Porsche's counterparties acquired too high a percentage of VW's shares as hedges, that particular counterparty would have its own legal obligation to disclose its ownership of those hedging shares, threatening indirectly to expose Porsche's accumulation of control over VW shares.  Any one counterparty's disclosure would alert the market that someone had entered into large derivatives positions with that counterparty.  The market then would be able to infer that a takeover of VW was in progress, as it would be clear that someone was acquiring control of VW's shares using options contracts purchased from the disclosing counterparty.

13.     To make sure the truth remained hidden, Porsche had to, and did, divide up its options contracts among numerous counterparties.  A court in this District recently recognized the deceptive nature of such intentional efforts to parcel out trades to evade the need for a counterparty to disclose shares it held as hedges. *See CSX Corp. v. The Children's Investment Fund Mgmt. (UK) LLP*, 562 F. Supp. 2d 511 (S.D.N.Y.), *aff'd*, 292 Fed. Appx. 133 (2d Cir. 2008).  Porsche engaged in the same deception here.

14.     Porsche's manipulation had the effect of both artificially increasing the demand for VW stock and artificially diminishing the supply of tradable shares.  Throughout the summer of 2008, market participants believed that Porsche was intending to implement its announced intent to acquire 51% of VW and no more.  The market further believed that Porsche already owned about 30% of VW directly and suspected that it might possess options that it could exercise for the remaining approximately 21%.

15.     In fact, Porsche's control over VW's float was much more extensive.  Porsche's secret plan was to control 75% of VW shares.  But Porsche faced a mathematical problem:  More than 25% of VW shares were controlled by shareholders who would not or, effectively, could not sell their VW shares to Porsche.  The largest of the shareholders who would not sell their VW shares to Porsche was the State of Lower Saxony, which controlled 20% of VW shares.  There were other investors, notably index funds, who were required to hold VW shares to track indices

that included VW shares.  Upon information and belief, those investors owned more than 5% of VW shares.

16.    Thus, as a practical matter, it was impossible for Porsche to acquire control of 75% of VW shares without short sellers.  Short sellers could increase the supply of VW shares by borrowing shares to sell.  Porsche benefitted as well when investors like Plaintiff entered the short side of securities-based swap agreements, because the swap counterparties themselves actually sold VW shares short to hedge their long-side exposure on the swap.  Porsche then bought call options from Porsche's counterparties, and Porsche's counterparties bought the shares that were being sold short to hedge the call options they sold Porsche.  The shares hedging all of the call options that Porsche's counterparties sold to Porsche sat available for delivery to Porsche on exercise.  Put simply, Porsche targeted short sellers in order to amass a position in VW shares that it could not have amassed on the open market without the short selling.

17.    As a result, by early September 2008, almost nobody owned VW shares except for Porsche, Lower Saxony, index-tracking funds that were required to hold the VW shares to mimic indices, and Porsche's counterparties (*i.e.*, investment banks) that were holding VW shares to hedge the call options they sold Porsche.  Porsche's manipulative conduct masked the fact that what appeared to the market (including Plaintiff) to be a large free float of VW shares was nothing of the kind.

18.    At the time of Porsche's announcement of the true extent of its control of VW shares and its true intentions with respect to VW, the short interest in VW was about 13%.[2] Porsche knew it had acquired control of 74.1% of VW's shares.  Porsche also knew that Lower Saxony held 20% of VW's shares.  Since 74.1% plus 20% equals 94.1%, and since some significant part (perhaps all) of the remaining 5.9% (*i.e.*, 100% minus 94.1%) was tied up with investors that would not sell (notably, index funds), this meant that a free float significantly below 5.9% was all that existed to satisfy a short interest of 13%.  In retrospect, there is little

[2] The "short interest" in a stock is the percentage of that stock that has been sold short.

surprise under these circumstances that the price of VW shares trended sharply and steadily upward throughout September 2008.  However, at the time, Porsche's deceptive conduct obscured to market participants the true dynamics that were driving VW's stock price.

19.     Porsche also benefited tremendously from this price rise in September 2008, because it protected Porsche from exposure on the put options it had sold to finance its efforts to corner the market in VW stock.  Porsche had acquired control over virtually the entire free float of VW shares by entering into derivatives contracts.  On a conference call with Porsche investors on October 2, 2007, Gaube referred to Haerter as the "mastermind" behind all options strategies related to the VW ownership stake. Haerter, according to Gaube, was a specialist in the derivatives markets and in the mathematics of options and other derivatives.

20.     Porsche used a strategy combining "call" options and "put" options.  Call options increase in value as the price of the underlying stock -- here, the price of VW shares -- rises. Because Porsche's counterparties would hedge the call options by buying VW shares, and would give those shares to Porsche at settlement of the call options, it was the call option part of Porsche's strategy that led most directly to control of the VW shares.  But call options cost money, and Porsche did not have the cash to buy all of the call options it needed to obtain control of VW.  Instead, Porsche paid for its call options by selling put options.  Put options obligated Porsche to pay its put option counterparties the difference between the "strike" price of the put option and the actual price of VW shares, if the put strike price was higher than the actual price. For example, if Porsche had previously sold a put option on VW shares to a counterparty with a strike price of €220 and the price of VW shares was at €270, Porsche would not owe the counterparty anything because the strike price of €220 was below the share price of €270.  But if the price of VW shares fell below €220, to, say, €210, then Porsche would owe the counterparty €10, the difference between €220 and €210.  In general, if the price of VW shares dropped below the put strike price, then Porsche had a liability to its counterparties for that difference, and as the price of VW shares fell, that liability increased.

8

21.     Selling put options was the only way that Porsche could afford to amass the huge position in call options that it announced on October 26, 2008. In essence, Porsche sold put options -- which obligated it to pay money if the price of VW shares declined -- in exchange for call options by which Porsche accumulated control of VW shares if the price increased. This strategy would work so long -- and only so long -- as the price of VW shares kept rising. A rising share price generated gains on the value of its call options (what counterparties owed Porsche) and reduced Porsche's liabilities on the value of the put options (what Porsche owed counterparties). Thus, Porsche had ample motive to manipulate the market in such a way as to keep the price of VW ordinary shares steadily rising throughout September 2008.

22.     Porsche's manipulative acts induced BMEA to enter securities-based swap agreements that would increase in value as the price of VW shares declined, and then caused BMEA to unwind those positions in September 2008 as the manipulation drove the share price relentlessly upward. By hiding the extent to which Porsche had completely cornered the market in VW shares -- an effort Porsche began no later than March 2008 and accomplished by September 2008 -- Porsche induced Plaintiff to open and maintain its short positions in VW shares between July 8, 2008, and September 19, 2008. Plaintiff relied on the market to provide an honest price. Key to the success of Porsche's manipulation of the market for VW's shares was Porsche's concealment both of its intent to acquire 75% of VW's outstanding stock and of the steps it was taking to accumulate those shares. Given the facts available to it, BMEA determined that the price of VW shares was too high. What Plaintiff could not see because of Porsche's fraudulent manipulation, however, was that VW shares were trading at prices that were the product of Porsche's concealed, unlawful cornering of the market in the stock. In short, Porsche led Plaintiff and other investors to believe, incorrectly, that the natural interplay of supply and demand determined the then-current prices of VW shares. In fact, both the supply of and demand for VW shares were skewed by Porsche's manipulative acts. Had the market and Plaintiff been aware that Porsche intended to take over VW and that Porsche had cornered the market in VW shares to do so, Plaintiffs would not have shorted VW.

9

23.    On October 26, 2008, a Sunday -- after BMEA had realized its losses from Porsche's unlawful manipulation of VW stock -- Porsche revealed its true control over VW: It then said that "[a]t the end of last week, Porsche SE held 42.6 percent of the Volkswagen ordinary shares and in addition 31.5 percent in so called cash-settled options relating to Volkswagen ordinary shares to hedge against price risks, representing a total of 74.1%." Never before had Porsche disclosed the true extent of its options, or admitted that the options should be added to the shares it owned outright to calculate its "total" stake. Porsche's representation of a "total" of "74.1%" confirms that Porsche viewed its options and its understandings with its counterparties as giving it control of the VW shares underlying the options. Porsche also admitted it aimed "to increase to 75% in 2009 paving the way to a domination agreement," putting the lie to its statement just weeks earlier that domination was "totally unrealistic."

24.    The *Wall Street Journal* reported on events immediately following Porsche's October 26, 2008 announcement:

> When financial markets opened Monday, October 27, all hell broke loose. Funds that had borrowed VW shares and sold them, expecting no takeover offer and betting the stock would decline, raced to purchase shares to unwind their bets. There weren't enough to go around. Part of the reason is that underwriters of cash-settled options typically hedge their risk by owning the shares of the company involved. The shares they owned, combined with those Porsche had acquired, added up to 74.1%, and Lower Saxony state owned 20.1%. The result was that while some 12.8% of VW shares were on loan, mostly to short sellers, those that for practical purposes were in circulation amounted to only 6% of VW shares. As hedge funds fought for the remaining VW shares, they drove the stock's price ever higher—deepening their losses. At the height of the short squeeze on Oct. 28, VW stock briefly topped 1,000 Euros, nearly five times as high as on Oct. 24, making VW the biggest company by stock-market value for a few hours.

Mike Esterl and Edward Taylor, "As Giant Rivals Stall, Porsche Engineers a Financial Windfall," *Wall Street Journal*, A1, November 8, 2008.

25.    Porsche's October 26 revelation marked the day that BMEA discovered that it had been the victim of unlawful stock manipulation by Porsche. BMEA now seeks to recover from

Porsche in this action the damages that it suffered as a result of Porsche's unlawful manipulative conduct.

## PARTIES

### Plaintiff

26.     Plaintiff BMEA is an exempted limited partnership organized under the laws of the Cayman Islands with a registered office located at M&C Corporate Services Ltd., Ugland House, P.O. Box 309, George Town, Grand Cayman, Cayman Islands, British West Indies.

27.     BlueMountain Capital Management, LLC ("BMCM") is the investment manager of BMEA.   Pursuant to an investment management contract with BMEA, BMCM has discretionary investment and voting power over the securities beneficially owned by BMEA.   In its capacity as investment manager, BMCM made the investment decisions to purchase on BMEA's behalf the security-based swap transactions referencing VW ordinary shares that are at issue in this action.   At all relevant times, BMEA was the owner of these swap positions. BMCM maintains a principal office at 280 Park Avenue, 5th Floor, New York, New York 10017.   BMCM performed its investment analyses and related functions, and made the investment decisions for BMEA to enter into the swap positions at issue in this suit, in the State of New York.   In making these decisions, BMCM relied on Porsche's material misrepresentations and omissions as detailed herein, as well as on the integrity of the market for VW ordinary shares.

### Defendants

28.     Until November 13, 2007, Defendant Porsche was known as Dr. Ing. h.c. F. Porsche Aktiengesellschaft.  On November 13, 2007, Dr. Ing. h.c. F. Porsche Aktiengesellschaft became a European stock corporation (Societas Europaea) and was renamed Porsche Automobil Holding SE.  Porsche is headquartered in Stuttgart, Federal Republic of Germany.

29.     Wiedeking was, at all relevant times, President and Chief Executive Officer of Porsche.  Upon information and belief, Wiedeking is a resident of the Federal Republic of Germany.

30.     Haerter was, at all relevant times, Vice President of Finance for Porsche.  Upon information and belief, Haerter is a resident of the Federal Republic of Germany.

31.     The gains to Porsche from its scheme flowed directly into the pockets of Defendants Wiedeking and Haerter, whose outsized compensations depended on Porsche's profitability.  Porsche reportedly paid Wiedeking an estimated $113 million in 2008.  Porsche reportedly paid Haerter an estimated $44 million in 2008.  Wiedeking and Haerter are referred to herein as the "Individual Defendants."

## SUBJECT-MATTER JURISDICTION AND VENUE

32.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because certain of Plaintiff's claims arise under § 10(b) and § 20(a) of the Exchange Act.

33.     This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

34.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(d), because Porsche, Wiedeking and Haerter are aliens.  Venue is also proper under Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

35.     In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange.

## PERSONAL JURISDICTION

36.     This Court has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(2), as well as under § 27 of the Exchange Act, 15 U.S.C. § 78aa, each of which extends personal jurisdiction to the limit of the Fifth Amendment's Due Process Clause.

**General Jurisdiction**

37.     The following facts demonstrate that Porsche has substantial, persistent contacts with the United States that make it generally amenable to suit in a United States court:

a.     The United States is the largest market for Porsche automobiles.

b.     Porsche reported that in 2005 it sold over 33,000 automobiles in the United States and Canada, 36,000 each in 2006 and 2007, and 27,000 in 2008.

c.     Porsche does extensive business in the United States through its agent, Porsche Automobiles North America, Inc., a Delaware corporation wholly-owned by Porsche through its subsidiary, with its principal place of business in Atlanta, Georgia.

d.     Porsche Automobiles North America performs substantial business activity on behalf of Porsche that, were it not for Porsche Automobiles North America, Porsche would perform itself.

e.     Porsche has an American Depositary Receipt ("ADR") that trades over the counter in the United States.  An ADR is a U.S. dollar-denominated form of equity ownership in a non-U.S. company.  It represents the foreign shares of the company held on deposit by a custodian bank in the company's home country and carries the corporate and economic rights of the foreign shares, subject to the terms specified in the ADR certificate.

f.     By 17 C.F.R. § 240.12g3-2, the SEC exempts foreign issuers such as Porsche from the gamut of ordinary securities registration requirements -- permitting the trading of ADRs -- only if the issuer complies with certain regulations.

13

g.      Porsche complies with the SEC's regulation of ADRs by providing English-language versions of its financial disclosures.   See 17 C.F.R. § 240.12g3-2(b)(1)(iii).

h.      Porsche knows that United States investors will reasonably rely on this information.

i.      Defendants Wiedeking and Haerter were actively involved in managing Porsche's business interests in the United States.  Wiedeking was a member of the boards of directors of Porsche Cars North America, Inc., and Porsche Enterprises Inc., each a Delaware corporation wholly-owned by Porsche through its subsidiary.  Haerter was a member of the boards of directors of Porsche Cars North America, Inc., Porsche Enterprises, Inc., and Porsche Financial Services Inc., each a Delaware corporation wholly-owned by Porsche through its subsidiary.

j.      Porsche has a long history of litigation in U.S. courts, where it has repeatedly sought protection as a plaintiff.  Cases in which Porsche has brought suit as a plaintiff include the following:  *Porsche Cars North America, Inc. [and Dr. Ing. h.c. F. Porsche AG] v. Porsch.com*, 99-cv-6 (E.D. Va.); *Porsche Cars North America, Inc. [and Dr. Ing. h.c. F. Porsche AG] v. Lloyd Design Corp.*, 99-cv-1560A (N.D. Ga.); *Porsche Cars North America, Inc. [and Dr. Ing. h.c. F. Porsche AG] v. Spencer*, 00-cv-471 (E.D. Ca.); *Porsche Cars North America, Inc. [and Dr. Ing. h.c. F. Porsche AG] v. Manny's Porshop, Inc.*, 96-cv-5924 (N.D. Ill.).  Nor, apparently, did Dr. Ing. h.c. F. Porsche AG object to personal jurisdiction in *Liquid Glass Enterprises, Inc. v. Dr. Ing. h.c.F. Porsche AG*, 97-cv-4978 (D.N.J.); or in *PFM Air, Inc. v. Dr. Ing. hc.F. Porsche A.G.*, 08-cv-392 (M.D. Fla.).

38.     As persons who controlled Porsche's fraudulent misstatements between March and October 2008, and as the direct source of many of those misstatements, Defendants Wiedeking and Haerter are responsible for Porsche's wrongdoing in, and directed toward, the United States.

**Specific Jurisdiction**

39.     The following facts demonstrate that Porsche had sufficient minimum contacts with the United States to render it amenable to this suit.  In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, interstate wire and telephone communications.

40.     As more fully described in this Complaint, Defendants' acts and conduct occurred in the United States, were directed at investors and investment managers in the United States, and had substantial, direct and foreseeable effects on Plaintiffs and other persons in the United States.

41.     Upon information and belief, Porsche began its efforts to acquire VW by purchasing a large block of VW shares from Brandes Investment Partners LLC, an American institutional investor in San Diego, California.

42.     Upon information and belief, it was Porsche's practice to distribute press releases, announcements, and other significant company news or documents by email, in English, to an undisclosed distribution list that reportedly included at least 30 recipients in the United States. The U.S. recipients were individuals at hedge funds, investment funds, and pension funds.

43.     Upon information and belief, Porsche used a substantially similar distribution list whenever it emailed press releases, announcements, and other significant company information.

44.     In addition, the Individual Defendants made statements related to Porsche's VW investment while they were in the United States:

        a.      On October 12, 2005, Defendant Haerter spoke on Porsche's behalf at the St. Regis Hotel in New York with American investors about Porsche's investment in VW.  Merrill Lynch's New York office sponsored this meeting between Porsche and American investors.  Porsche's American meeting was part of a road show about which the *Financial Times* reported on October 2, 2005:   "Conscious of the market's

15

skepticism, Porsche will from this week meet UK and US investors to try to convince them of the merits of its plan."

       b.     On January 9, 2007, at the North American International Auto Show in Detroit, Defendant Wiedeking met with reporters in a conference room inside Detroit's Cobo Center. Of the 69 questions posed to Wiedeking during an hour-long group interview, 64 pertained to VW.

       c.     On January 10, 2007, *Business Week* reported an interview between its Detroit correspondent David Kiley and Defendant Wiedeking that took place at the auto show in Detroit. Kiley asked Wiedeking why Porsche was not paying a premium for control of VW. Wiedeking responded, "Why should I pay a premium? No. I don't see any reason for this, 29% is enough for Porsche. We won't acquire more than 50%."

45.     At all relevant times, Porsche maintained an English language website with an archive of English language press releases. Porsche used this website to target its misrepresentations at U.S. investors. Porsche did not translate all of its press releases into English, but it did translate all of them that related to Porsche's intentions and positions with respect to VW. Furthermore, U.S. investors visiting Porsche's U.S. website were directed to Porsche's English language website to obtain investor relations information.

46.     Defendants' wrongful conduct had a substantial effect in the United States and upon United States residents.

47.     Plaintiff's investment decisions relating to its VW investments were made by its investment manager, BMCM, located in New York, New York.

48.     As of October 2008, the managers who direct funds to BMEA are predominantly located in the United States. Indeed, out of 27 managers in the fund, nineteen of them are based in the United States, including ten BMCM principals that are either citizens or residents of the United States. Accordingly, Porsche's unlawful and manipulative conduct in connection with VW stock directly harmed investors located in the United States.

49.    As evidenced by Porsche's statements on October 26, 2008, Defendants knew that the primary victims of their scheme would be hedge funds that took short positions (whether directly or, like Plaintiff, via swaps) in VW shares.  As explained above, Porsche's fraudulent strategy deliberately targeted hedge funds that would enter into short positions (direct and via swaps).  In order to secretly obtain 75% ownership in VW, Porsche needed short sellers to borrow stock from current owners who would not, or could not, sell the stock themselves and then to sell it to Porsche or Porsche's call option counterparties.  Without the additional supply created by short sellers, Porsche never could have achieved 75% ownership in VW shares.

50.    Upon information and belief, Defendants knew that hedge funds and the managers who make their investment decisions are concentrated in a small number of locations, with the majority of investment managers based in and around New York, New York.  Therefore, upon information and belief, Defendants (a) needed to affect investment decisions in the United States to pull off their plan and (b) knew that American-based investment managers would rely, in the United States, on Defendants' fraudulent misstatements -- and that the hedge funds they advised would be the primary victims of Defendants' fraud and manipulation.

51.    While VW shares traded on European exchanges, U.S. investors were far more important owners of VW shares than were German institutional investors.  In its 2004 Annual Report, VW reported:

> As the largest single shareholder, the State of Lower Saxony held 18.2% of the ordinary shares. ... A further tranche of shares is held by investment consultant Brandes Investment Partners, LCC [sic], San Diego, California, USA, which notified Volkswagen AG on July 28, 2004 that the total proportion of ordinary shares held by its clients amounted to 10.7% of all ordinary shares (22.2 million ordinary shares and 59.4 million American Depositary Receipts). The proportion of Volkswagen shares held by foreign institutional investors (including Brandes Investment Partners LLC) rose to 38.9% in the year under review (previous year: 34.1%). German institutional investors held 7.4% (9.3%).

52.    In its 2005 Annual Report, VW reported the continued importance of U.S. investors in VW shares:

17

As of December 31, 2005, the subscribed capital of Volkswagen AG comprised 321,929,800 ordinary shares and 105,238,280 preferred shares. As the largest single shareholder, Dr. Ing. h. c. F. Porsche Aktiengesellschaft held 18.5% of the voting shares at the balance sheet date. This corresponds to 14.0% of subscribed capital. The State of Lower Saxony held 18.1% of the ordinary shares or 13.6% of subscribed capital. As of December 31, 2005, Volkswagen AG held 41,719,353 ordinary treasury shares, corresponding to 13.0% of all ordinary shares or 9.8% of subscribed capital. A further tranche of shares is held by investment consultant Brandes Investment Partners, LCC [sic], San Diego, California, USA, which notified Volkswagen AG that the total proportion of ordinary shares held by its clients amounted to 8.58% of all ordinary shares on September 30, 2005. On October 11, 2005, investment management company The Capital Group Companies, Inc., Los Angeles, USA, held 3.504% of the voting capital of Volkswagen AG. The proportion of subscribed capital held by foreign institutional investors — including Brandes Investment Partners, LCC [sic] and The Capital Group Companies, Inc. — was 31.1% in total (previous year: 38.9%). German institutional investors held 7.0% (7.4%).

53.   In its 2006 Annual Report, VW reported:

At the end of 2006, the subscribed capital of Volkswagen AG comprised 286,980,067 ordinary shares and 105,238,280 preferred shares. Dr. Ing. h.c. F. Porsche Aktiengesellschaft notified us that its share of voting rights in Volkswagen AG on November 13, 2006 was 27.40%, corresponding to 20.0% of subscribed capital. This means that Dr. Ing. h.c. F. Porsche Aktiengesellschaft is the largest single shareholder. The State of Lower Saxony held 20.26% of the ordinary shares on January 20, 2007, corresponding to 14.8% of subscribed capital. In 2006, the proportion of Volkswagen shares held by foreign institutional investors decreased to 23.9% (previous year: 31.1%). German institutional investors held 5.8% (7.0%).

54.   U.S. investors did not limit their purchases of VW shares to those that they executed on foreign exchanges. VW also had (and still has) two sponsored ADR programs. Both of VW's ADR programs, representing ordinary and preference shares, are sponsored by J.P. Morgan and trade in the U.S. on the over-the-counter ("OTC") market. Each ADR represents one-fifth of one VW share. Upon information and belief, most, if not all, of the ADRs were and are held by American investors.

**PORSCHE'S FRAUDULENT MANIPULATION OF THE MARKET FOR VW**

A.    **Porsche's Early Acquisitions of VW Shares**

55.    Porsche began acquiring VW shares in late September 2005. By September 28, 2005, Porsche had acquired a 10.26% voting stake in VW and expressed a desire to increase its ownership interest to 20%. Porsche's stated reason for acquiring VW shares was to lessen the possibility that VW would be subject to a hostile takeover which, Porsche claimed, could threaten business relationships between Porsche and VW.

56.    Discussions about a potential hostile takeover of VW were sparked by speculation that the European Court of Justice would soon invalidate a previous version of the VW Law that limited any one VW shareholder's voting rights to 20%, regardless of the number of shares held. The European Commission already had taken the position that the VW Law violated European Union law, and Porsche believed a hostile takeover attempt might follow invalidation. According to Porsche, its planned investment was "the strategic answer to this risk," but in no case, Porsche said, would its stake "reach the level at which Porsche would have to make a public offer to take over VW[,]" *i.e.,* 30%, under applicable German law. Merrill Lynch advised Porsche with respect to its acquisition of VW shares.

57.    Porsche continued with its acquisition of VW shares throughout 2005. On October 7, 2005, Porsche purchased an additional 8.27% of VW shares from institutional investors and held 18.53% of the total. Porsche acquired shares from, among other investors, Brandes Investment Partners LLC in San Diego.

58.    Because many of VW's shareholders were United States residents, Porsche sought to address American investors' concerns about the motive behind its acquisitions. On October 12, 2005, Porsche employees, including Haerter, met with investors in New York at a meeting sponsored by Merrill Lynch to discuss Porsche's acquisition of VW's shares. The *Financial Times* reported that Porsche recognized "the market's skepticism" about Porsche's acquisition of the VW shares. In response, Porsche wanted to "meet UK and US investors to try to convince them of the merits of its plan."

59.     Throughout the next year, Porsche continually downplayed its acquisition of VW stock.  On January 23, 2006, for example, Porsche's Manfred Ayasse stated:  "We [Porsche] control 18.53 percent as well as an option for a further 3.4 percent[, but] there are currently no plans whatsoever of increasing the VW stake beyond this."  On January 27, 2006, Haerter stressed that while Porsche intended to exercise its VW options at some indeterminate date, Porsche would not take its VW stake beyond the roughly 22% it would hold after exercise.

60.     On February 24, 2006, VW retired a portion of its outstanding shares.  This action increased Porsche's stake to 21% of the total VW shares (or a 25% stake if it exercised options it held to buy additional shares).  Then, on November 13, 2006, Porsche raised its stake from 21% to 27.3% of total VW shares by purchasing shares and exercising options.

61.     While continuing to increase its ownership interest in VW shares, Porsche announced on November 15, 2006, that it would raise its stake to just below 30%, the threshold at which German law would require it to launch a full tender for VW shares.

62.     Porsche continued its acquisition of VW shares in 2007.  On January 10, 2007, *Business Week* reported an interview between its Detroit correspondent David Kiley and Wiedeking that took place at the auto show in Detroit.  During this interview, Wiedeking discredited the idea that Porsche was seeking to obtain control of VW.  Kiley asked Wiedeking why Porsche was not paying a premium for control of VW.  "Why should I pay a premium?" Wiedeking asked in response.  "No. I don't see any reason for this; 29% is enough for Porsche. We won't acquire more than 50%."

63.     Porsche repeated the refrain on March 24, 2007, announcing that it planned to boost its stake to up to 31% but noting "[w]e don't want a majority."  Porsche said the decision to cross 30% followed the February 13, 2007, recommendation by an adviser to Europe's high court that the judges should invalidate the VW Law.  "We expect that law will be repealed entirely," the Porsche spokesman said.

64.     On March 25, 2007, Porsche increased its stake in VW again, moving to 31% from 27.3%.  Porsche reported that the purchase was to prevent hedge funds from taking over

and breaking up VW.  "If hedge funds were to break up Volkswagen and publicly list [the company's individual brands] we would risk losing our most important partner.  We cannot let such a breakup happen.  That's why we acted," Wiedeking said.  The very next day, March 26, Porsche exercised share options to raise its voting stake in VW to 30.9%.  "We can now react even more quickly should hedge funds want to take a stake in VW," Wiedeking told a newspaper.

65.    By March 28, 2007, Porsche held 30.9% of VW's shares.  On account of the 30% ownership, German law required Porsche to submit a full tender bid on the remaining VW shares.  While Porsche made the mandatory bid, it did so at the lowest possible price -- a price no rational investor would accept since it was below the then-prevailing market price -- and publicly disclaimed any interest in taking over VW outright.

66.    Not surprisingly, VW's board determined that the mandatory offer was too low.  VW's board announced that it could not recommend to shareholders that they accept Porsche's tender, as the fundamental valuation of VW shares was higher than Porsche's offer price.

67.    As of December 31, 2007, Porsche was VW's largest shareholder, with approximately 31% of VW's shares.  The State of Lower Saxony held 20.1%.  In the reporting period ending December 31, 2007, VW reported that the proportion of VW shares held by foreign institutional investors had increased to 25.6% (previous year:  23.9%).  German institutional investors held 6.2% (previous year:  5.8%).  Upon information and belief, a substantial portion of the shares held by foreign institutional investors was held to hedge Porsche's options on VW's shares.

### B.    Porsche Misrepresents Its Actual Control over VW Shares and Corners the Market Through Manipulative Derivatives Transactions

68.    At the beginning of 2008, Porsche launched a secret plan to corner the market in VW stock by accumulating additional, large positions in VW through both open market, disclosed purchases, and by secretly acquiring a significant ostensibly synthetic long position in VW ordinary shares through the purchase of small (less than 5% each) cash-settled option

positions with many separate banks serving as counterparties. Porsche representatives had held a secret meeting in Berlin on February 25, 2008, with a high-ranking officer of the Government of the State of Lower Saxony participating on behalf of Prime Minister Wulff. As the German press first reported in May 2009, Porsche there stated its intention to implement a domination and profit transfer agreement, both of which require at least 75% ownership. Porsche then implemented a strategy to acquire that stake surreptitiously.

69.     The cash-settled positions that Porsche began to accumulate in 2008 were option contracts where the settlement is done via the payment of cash equal to the difference between the contractual value ("strike price") and market value of the option at the time of exercise or expiration. This implied to the market that there was no requirement for the actual delivery of the underlying security. However, such options can also be settled physically upon party agreement (which is precisely what Porsche intended to do), and banks that underwrite cash-settled options typically hedge their exposure by holding actual shares, which take these shares out of general circulation. Indeed, Porsche told analysts at the Frankfurt Auto Show in September 2007, more than six months before its March 4, 2008, half-yearly report, that Porsche could take delivery in physical stock after it exercised its options.

70.     By treating physical settlement options as cash-settled options that need not be disclosed, and spreading the options among numerous counterparties to prevent any one counterparty from acquiring a discloseable position in VW stock, Porsche concealed from the market the extent of its control over available VW shares.

71.     Moreover, in an effort to ensure that its increasing stake in VW was hidden from view and to induce short selling of VW shares, Porsche also made affirmative misrepresentations that it was neither purchasing nor intending to purchase a quantity of VW shares that could corner the market. Porsche fostered a false belief in the marketplace that it controlled far less of the float in VW shares than it actually did.

72.     In its half-yearly Financial Report from Stuttgart, Germany, dated March 4, 2008, which upon information and belief Katharina Dippell ("Dippell") emailed into the United States

on Porsche's behalf, and that Porsche translated into English and published on its website, Porsche stated that once "antitrust clearance has been given, Porsche SE will acquire the majority shareholding in Volkswagen, with a view to creating one of the world's most innovative and efficient automotive alliances...."

73.     Porsche's statement was misleading.  Against the backdrop of Porsche's repeated public assurances that it did not intend to take over VW, the statement "Porsche SE will acquire the majority shareholding in Volkswagen" tells a reasonable investor that Porsche intended to increase to a share slightly more than the 50% required for clear majority voting.  In addition, the use of the word "alliances" suggests a cooperative working arrangement, not a situation in which one company takes over another, which is the case when a domination and profit transfer agreement is implemented.  In fact, Porsche already had decided to acquire 75% of VW.

74.     In a corporate statement from Stuttgart, Germany, on March 10, 2008, which upon information and belief Porsche translated into English and Dippell emailed into the United States, Porsche denied that it would seek to raise its stake to 75% and said talk of such a move "does not consider the realities of VW's shareholder structure.... In view of the fact that the German Federal State of Lower Saxony, as the second major shareholder, holds a stake of more than 20% in [VW], the probability of acquiring the necessary shares from the free float is very small indeed. The background of the current media reports is obviously provided by rumors on the Stock Exchange which can be traced back to the speculative mind games of analysts and investors."

75.     Porsche's statement that it would not raise its stake in VW to 75% was false, as it already had decided to do so.  Moreover, Porsche's statement that "the probability of acquiring the necessary shares from the free float is very small" was false.  The probability of acquiring the requisite shares for domination from the free float was, for Porsche, extremely high due to its carefully orchestrated manipulation of the market.  Porsche already had entered into options contracts for many of the VW shares it needed to achieve domination.  Porsche's counterparties had hedged those options by buying shares.

76.     Porsche targeted short sellers to acquire control of the shares it desired.  As a practical matter, it would have been impossible for Porsche to acquire control of 75% without short sellers.  Short sellers could increase the supply of VW shares.  Porsche benefitted as well when investors like Plaintiff entered securities-based swap agreements, because the swap counterparties themselves sold VW shares short to hedge their long-side exposure on the swap. Porsche induced investors to borrow VW shares and short them, undertaking an obligation to repurchase the shares and return them at a future date.  Porsche then bought call options from its counterparties, and Porsche's counterparties bought shares from Plaintiffs to hedge the call options they sold Porsche.  The VW shares hedging all of the call options that Porsche's counterparties sold to Porsche sat available for delivery to Porsche on exercise.

77.     By July 2008, the market was convinced that, given the unfolding international financial crisis and the collapse of several large companies in the auto sector, VW's shares were grossly overvalued relative to its economic fundamentals and that the stock price was being supported by Porsche's desire to increase its stake in VW to 51%, as it had previously announced.  However, because the market believed Porsche's denials that it intended to go above 51%, a consensus developed that VW's stock price would collapse as soon as Porsche completed the purchases necessary to get it to 51%.  Based on Porsche's statement of its intentions, the market also believed that it only controlled enough of VW's available float through direct ownership and options positions to enable it to reach that threshold.  Specifically, the market consensus was that Porsche directly owned about 31% of VW and might have options positions that would enable it to acquire the remaining 21%.  Thus, it appeared to the market that ample float remained to allow for the downward adjustment of VW's stock price once Porsche acquired its majority in VW and the demand for VW shares disappeared.

78.     On or about July 8, 2008, BMEA began opening short positions worth millions of dollars in VW stock by entering into securities-based swap contracts that reference VW's ordinary shares.  At this time, VW was trading at approximately €170 per share.

79.     Meanwhile, Porsche continued to feed the market's misperception of its intent and degree of control over the market for VW stock.  On July 28, 2008, Defendant Haerter told the German newspaper the *Frankfurter Allgemeine Zeitung*:  "We're determined to cross the 51% threshold this year."  Reuters reported that Haerter told the paper that Porsche owns some 31% in VW, and has secured binding contracts over the purchase of another 5%.  Haerter said Porsche had already secured the purchase price for additional VW shares through financial instruments. Upon information and belief, Haerter was in Stuttgart, Germany when he made this statement.

80.     Porsche's statement was misleading.  Against the backdrop of Porsche's repeated public and private assurances that it did not intend to take over VW, referring to the "51% threshold" tells a reasonable investor that Porsche intended to increase to a share slightly more than the 50% required for clear majority voting.  In fact, Porsche already had decided to acquire 75% of VW.  Moreover, as of mid-2008, Porsche was well on its way to achieving control surreptitiously over nearly 75% of VW shares through outright positions and options.

81.     Indeed, by early September 2008, Porsche actually controlled 75% of VW's outstanding shares through either outright ownership or call options positions.   This put incredible upward pressure on VW's share price, and caused that price to rise dramatically over the course of September 2008 despite growing economic turmoil and the collapse of global credit markets in general and the automotive industry in particular.  The reason for this price rise was simple:  Porsche's surreptitious and manipulative cornering of the market.  Because Porsche had been in the market acquiring large blocks of VW stock to obtain its super-majority of shares, and because neither Porsche nor Lower Saxony (the next largest VW shareholder) was selling, VW shares became extremely scarce and caused the price of VW stock to shoot up.  This price increase suited Porsche just fine, since it controlled its exposure on the VW put options it had sold to finance its acquisition strategy.

82.     The only thing that kept the price from spiking uncontrollably (as it subsequently did in the wake of Porsche's October 26, 2008 announcement) was that short sellers continued to enter the market by borrowing VW shares and selling them.  Short sellers took this action

because, given how successfully Porsche concealed the fact that it had manipulatively cornered the market for VW stock, there was no rational explanation for why VW shares were continuing to rise in price when the rest of the auto sector was tanking. Many investors concluded that a severe downward correction in VW's share price was inevitable, and thus fed Porsche's strategy by continuing to short the stock.

83.     The losses mounting in BMEA's short position as a result of Porsche's manipulation of the market, however, soon became too large for Plaintiff to bear. On or about September 18, 2008 -- after VW's stock hit €304 a share -- BMEA was forced to close out its short positions, incurring millions of dollars in losses.

84.     On the same day, in a corporate statement that, upon information and belief, Porsche made from Stuttgart, Germany, Porsche told an online magazine that a domination agreement with VW was "totally unrealistic" -- thereby continuing to conceal its manipulative conduct. Porsche's statement was false. Porsche already had decided to seek domination of VW. Ferdinand Piech, who resigned as a member of the Executive Committee of Porsche's Advisory Board because "vital information" about Porsche's options in VW shares was concealed from him, admitted in a May 2009 interview that even he knew of Porsche's plan to increase its stake in VW up to 75% as early as mid-year 2008. Porsche also already had locked up sufficient shares to achieve domination through options contracts.

85.     Confirmation of Porsche's manipulation of the market for VW stock came on October 26, 2008. On that date, Porsche revealed for the first time that it already controlled almost 75% of VW shares. In an October 26, 2008, press release, which upon information and belief Gaube emailed into the United States, Porsche said: "At the end of last week, Porsche SE held 42.6 percent of the Volkswagen ordinary shares and in addition 31.5 percent in so called cash settled options relating to Volkswagen ordinary shares to hedge against price risks, representing a total of 74.1%."

86.     By referring to the cash settled options as "so called," Porsche communicated that those options entitled it to more than just cash upon exercise. Porsche underlined this point by

adding the percentage of VW shares underlying its options to the percentage of VW shares it held outright. This was something Porsche had not done in any of its previous announcements. On September 16, for example, a Porsche press release had described the VW shares it owned outright as its "total stake." The sudden change in characterization, coupled with Porsche's use of the words "so called," signaled that Porsche believed it controlled the VW shares underlying its cash settled options, just as it controlled the VW shares it owned outright.

87.   Porsche's new and surprising message was received loud and clear by multiple press outlets on October 27, 2008, and October 28, 2008, including two of the most prestigious business publications in the United States:

> Porsche Automobil Holding SE on Sunday said it had a near-75% stake in Volkswagen AG a much larger stake than the market expected, and said it wanted to tighten its grip on Volkswagen with a so-called domination agreement that would give it access to Volkswagen's cash flows.
>
> Porsche announced it had control of 31.5% of Volkswagen through cash-settled options in addition to the 42.6% of shares it currently holds, leaving it just 0.9% short of the 75% level needed to log Volkswagen's revenues and assets in its own books.
>
> Previously, Porsche's Volkswagen stake was known to be 35.14% plus an undisclosed number of options.

Christoph Rauwald, "Porsche Gains Nearly 75% of VW, Tightening Grip," B3, *Wall Street Journal*, October 27, 2008.

> The automakers jumped after Porsche reported Sunday its cash-settlement options equal almost a 32% ownership stake in the company, as well as a 43% stake in the company's common shares.
>
> That increased Porsche's known holdings of its compatriot automaker to just below the 75% threshold needed for majority control under German law. Previous information showed Porsche holding a one-third share.

Alan R. Elliott, "Porsche Stake Boosts Ailing Automakers," B03, *Investor's Business Daily*, October 28, 2008.

> Porsche said it had increased its effective holding of ordinary VW shares to 74.1 percent of the total. That is up from mid-September, when Porsche said its stake was 35.14 percent. VW is a heavily shorted stock, so when Porsche's announcement came out, implying that an already-small public float had shrunk further, the short bet immediately became riskier. That likely persuaded short-sellers to snap up VW shares to reduce or close their bets, leading to the rip-roaring rally.

Peter Eavis, "Porsche's New Spin on VW," Heard on the Street, C12, *Wall Street Journal*, October 28, 2008.

88.     Porsche also went on to admit, contrary to its earlier statements, that it sought to acquire 75% of VW's shares and "dominate" VW.  "Assuming the economic framework conditions are suitable," Porsche said in the same October 26, 2008, press release, "the aim is to increase to 75% in 2009, paving the way to a domination agreement."  Far from being "totally unrealistic," as Porsche had claimed just weeks earlier, domination of VW was well within Porsche's grasp, as it had been since at least the beginning of September 2008.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

89.     At all relevant times, the market for VW's publicly traded ordinary shares was an efficient market that promptly digested current information with respect to VW from publicly available sources and reflected such information in the prices of VW's shares and associated security-based swaps, for the following reasons, among others:

(a)     VW ordinary shares met the requirements for public listing and were listed and actively traded on the Frankfurt, London, Luxembourg and Swiss stock exchanges, all highly efficient and automated markets;

(b)     VW ADRs traded on the OTC market, and VW filed periodic public reports with the SEC and NYSE relating to its ADR programs;

(c)     VW regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the

national circuits of major newswires and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

    (d)  VW was followed by analysts from major brokerages, including Lehman Brothers, Deutsche Bank, Morgan Stanley, Citigroup and Merrill Lynch. The reports of these analysts were redistributed to the brokerages' sales force, their customers, and the public at large.

    90.  As a result, the market for VW publicly traded ordinary shares promptly digested current information with respect to VW from all publicly available sources and reflected such information in the price of the shares. Similarly, the prices for equity swaps referencing VW ordinary shares also digested all available information and reflected it in the applicable prices as well. Under these circumstances, all sellers (including short sellers) of VW ordinary shares, and all parties (like Plaintiff) on the wrong end of security-based swap agreements with VW shares as the referenced security, suffered similar injury through their establishing trading positions and undertaking transactions at artificially depressed prices. A presumption of reliance by Plaintiff therefore applies in connection with its claims under the federal securities laws.

## NO SAFE HARBOR

    91.  The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to facts and conditions existing at the time the statements were made. Accordingly, no statutory safe harbor applies to Porsche's material false or misleading statements.

    92.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Porsche is liable for those false forward-looking statements because at

the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Porsche who knew that those statements were false when made.

## CAUSES OF ACTION

### COUNT I

### MARKET MANIPULATION IN VIOLATION OF § 10(b) OF THE EXCHANGE ACT AND RULE 10b-5
(Against Porsche)

93.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

94.    Plaintiff transacted securities-based swap agreements within the meaning of 15 U.S.C. § 78j(b).  These securities-based swap agreements referenced the price of VW shares. These securities-based swap agreements were transacted in the United States.  In particular, BMCM, the investment manager for BMEA, was in the United States, specifically, at 280 Park Avenue, Fifth Floor, New York, New York 10017, when it took all steps necessary to transact the securities-based swap agreements for BMEA.  Morgan Stanley, based in New York, was the counterparty on these swap agreements.  All of the securities-based swap agreements that BMEA transacted are governed by documents with choice of law provisions providing for New York law, and forum selection provisions designating New York federal and state courts as the exclusive fora in which suit may be brought.

95.    Porsche carried out a plan, scheme and course of conduct which was intended to and did deceive BMEA, as alleged herein, and induced BMEA to enter into the short side of securities-based swap agreements (*i.e.*, swap agreements that would generate gains as the price of VW shares fell) between July 8, 2008, and September 19, 2008.

96.    Porsche, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged in manipulative acts from March 4, 2008,

through September 19, 2008, that, although they initially kept the price of VW's shares lower than it would have been had all of the facts been made public, ultimately caused VW's stock price to rise to the point where it caused enormous losses to BMEA on its open VW short positions. Porsche accomplished this manipulation by (a) disguising physical options as cash-settled options to avoid the mandatory disclosures that accompany physical-settled options, (b) concealing from the market the size of its option positions as a percentage of the available float for VW stock as part of its plan to conceal its intent to acquire 75% of VW's outstanding stock, and (c) methodically parceling out its option contracts in an effort to make sure that no single counterparty as part of a hedging strategy accumulated too large a position in VW stock such that it would trigger an obligation to disclose that position.

97.     Porsche's market manipulation caused BMEA's losses. Porsche's manipulative acts caused these losses because Plaintiff relied on the market for VW shares being free of manipulation when it entered into securities-based swap agreements referencing VW shares. Porsche's market manipulation induced BMEA to take short positions in VW shares via securities-based swap agreements from July 8, 2008, through September 19, 2008, at prices lower than would have existed had all of the facts been made public which then became economically untenable as VW's stock price rose through September 2008 as a result of Porsche's manipulation of the stock. Porsche's accumulation of options effectively reduced the available float for VW stock far below what the market believed existed, which had the effect in September 2008 of driving Porsche's stock price ever higher.

98.     BMEA is managed by BMCM, a professional investor who at all relevant times took into account statements that Porsche made publicly about its plans with respect to VW and its ownership of VW shares. At the time of Porsche's manipulation, BMEA was ignorant of Porsche's manipulative acts. Had BMEA known the truth regarding Porsche's true intentions with respect to the acquisition of VW's shares, or had BMEA known that Porsche had hidden the extent of its control of additional VW shares through deceptive distribution of options trades designed to evade counterparty disclosure laws, BMEA would not have taken short positions in

VW shares via securities-based swap agreements, or, if it had, it would not have done so at the prices which it accepted.

99.     Porsche had actual knowledge of the misrepresentations and omissions of material facts alleged herein, and intended to deceive BMEA and hide the extent of Porsche's control of additional VW shares through deceptive distribution of options trades designed to evade counterparty disclosure laws. Porsche engaged in its deceptive conduct knowingly and for the purpose and effect of concealing its true intentions with respect to the acquisition of VW's shares.

100.     By virtue of the foregoing, Porsche has violated § 10(b) of the Exchange Act and Rule 10b-5.

101.     As a direct and proximate result of Porsche's wrongful conduct, BMEA suffered damages in connection with short positions in securities-based swap agreements referencing VW shares that it opened between July 8, 2008, and September 19, 2008.

102.     Plaintiff has brought this claim within two years of discovery of the violations alleged herein on October 26, 2008, and within five years of the violations alleged herein. Consequently, this action is timely.

**COUNT II**

**VIOLATIONS OF § 20(a) OF THE EXCHANGE ACT**
**(Against The Individual Defendants)**

103.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

104.     Wiedeking and Haerter each acted as a controlling person of Porsche within the meaning of § 20(a) of the Exchange Act, as alleged herein. By virtue of their high-level positions, participation in and/or awareness of Porsche's acquisition plans with respect to VW shares, Wiedeking and Haerter each had the power to influence and control, directly or indirectly, the decision-making of Porsche, including the content and dissemination of the press

32

releases concerning Porsche's intentions with respect to the acquisition of VW's shares and the execution of Porsche's manipulative options strategy.   The Individual Defendants culpably participated in Porsche's fraud, as alleged herein.

105.   As set forth above, Porsche violated § 10(b) of the Exchange Act and Rule 10b-5 by its acts and omissions as alleged in this Complaint.   By virtue of their positions as controlling persons, the Individual Defendants are each liable pursuant to § 20(a) of the Exchange Act.

106.   As a direct and proximate result of the Individual Defendants' wrongful conduct, BMEA suffered damages in connection with short positions in securities-based swap agreements referencing VW shares at artificially low prices from July 8, 2008, through September 19, 2008.

107.   Plaintiff has brought this claim within two years of discovery of the violations alleged herein on October 26, 2008, and within five years of the violations alleged herein. Consequently, this action is timely.

## COUNT III

### TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (Against Porsche)

108.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

109.   BMEA had a profitable business relationship with the counterparties to the security-based swap agreements that it entered into and which referenced VW ordinary shares.

110.   As alleged herein, Porsche interfered with that business relationship by using dishonest, unfair, improper and/or wrongful means -- in particular, fraud and misrepresentations.

111.   As a direct and proximate result of Porsche's wrongful interference, BMEA suffered damage to its business relationship with the swap counterparties and was compelled to terminate the swap contracts, thereby incurring substantial losses.

33

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff BlueMountain Equity Alternatives Master Fund L.P. hereby demands judgment against Defendants in each Cause of Action of the Complaint, and requests the following relief:

A.     Monetary damages awarded to Plaintiff in an amount to be determined at trial;

B.     Pre-and post-judgment interest as allowed by law;

C.     Reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.     Such other and further relief to which Plaintiff is justly entitled.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial as to all issues so triable.

Dated:  October 25, 2010
New York, New York

**LOWENSTEIN SANDLER PC**

By:_____

Zachary D. Rosenbaum
Lawrence M. Rolnick
Thomas E. Redburn, Jr.
Sheila A. Sadighi
1251 Avenue of the Americas
New York, New York 10020
Tel.:  212.262.6700
Fax:  212.262.7402
-and-
65 Livingston Avenue
Roseland, New Jersey 07068
Tel.:  973.597.2500
Fax:  973.597.2400
zrosenbaum@lowenstein.com
lrolnick@lowenstein.com
tredburn@lowenstein.com
ssadighi@lowenstein.com

*Attorneys for Plaintiff*
 *BlueMountain Equity Alternatives*
 *Master Fund L.P.*